Good morning. Good morning. May it please the Court. I'm Michael Weinstein from the Federal Public Defender, appearing for the Petitioner Appellant Dean Carter. Your Honors, as you mentioned, this is the first of two appeals for Carter today. And as the Court knows, this appeal contains two certified claims, and the Court has requested supplemental briefing on an additional two. Given that I have limited time today, I would like to focus my comments first on the claims that I think could benefit most from argument, and those claims are the conflict claim and the ineffective assistance of counsel at penalty claim. And I am happy to answer any questions the Court has about the other claims, too, but I would like to start with those. And I'll keep my eye on the clock, but I would like to reserve six minutes for rebuttal. All right. So beginning with the conflict claim, this claim really arises at the intersection of two different rights that are both foundational and fundamental to our criminal justice system. And that's the right to conflict-free counsel and the right to testify. And what I want to make sure is perfectly clear after today's argument is that the conflict claim actually has two independent bases for it, two different legal theories, either one of which leads to an independent reason to grant habeas relief. The first theory focuses on the trial judge and asks, did he adequately inquire into a conflict that was brought to his attention? Let me stop you here because you've repeated the word conflict multiple times. But, in fact, we're not talking about a conflict of interest similar to the cases that the Supreme Court has discussed, the right to conflict counsel. And, indeed, I think your reply brief acknowledges as much. There's no claim here that the lawyer had a different client or a different personal interest different from your client's. The argument is that the two of them disagreed as to strategy. I'm not sure how that comes under the vernacular conflict or conflict-free. It seems to me this is a fundamental ineffective assistance of counsel claim and should be treated that way. So the short answer to, I think, this comment, Your Honor, is this is not the traditional type of conflict. But if we're analyzing it. Roberts. Do you have any case that uses the conflict language and applies? When you have a conflict of interest, it's critical for an IAC analysis because the prejudice clause is treated very differently. Do you have any authority, any precedent that treats the kind of conflict we have here, where there's a disagreement in approach between client and counsel, treats that as a, quote, conflict case for purposes of prejudice analysis?  Yes, I do, Your Honor. There are two cases I would draw the Court's attention to. One case is Daniels v. Woodford, which analyzes whether there was an irreconcilable conflict between the attorney and his client. And that was the second theory. And I'll just shift to that because that seems to be the Court's interest. Daniels v. Woodford also dealt with. What was your second case? You said you have two cases. Oh, I'm sorry. United States v. Walker. And the reason why I want to talk about both of those cases is both of those cases dealt with what we're dealing with today, which is the intersection of a right to conflict-free counsel and the right to testify, because in both those cases, the conflict, according to this Court, was that the defense attorney was overriding his client's desire to testify. That's what happened in United States v. Walker, and that's exactly what happened in Daniels v. Woodford. Now, to be clear, we only get there, though, if we first analyze this claim under 2254d-2. And what we have to do is show an unreasonable determination of the facts. And one of the key issues for our conflict claim is whether Carter insisted on testifying. And I think the record's pretty clear that he was consistent and unwavering in his desire to testify. We had the first Marsden hearing that was held during the guilt phase. And during that Marsden hearing, Gillingham told the court that his client emphatically disagreed with his strategy to rest without presenting any witnesses. And then at the second Marsden hearing, at the second Marsden hearing, Gillingham admitted that he had forgotten to tell the court that by resting without presenting any witnesses, he was interfering with his client's right to testify. And then that's what makes this case similar to Daniels v. Woodford and United States v. Walker. Counsel, in Daniels v. Woodford, what was the nature of the conflict? The nature of the conflict was both a conflict over whether the client was going to testify and how to litigate the rest of the case. Wasn't it our typical conflict case where there was an inability to communicate and a loss of trust in that case? Well, that was part of the extent of conflict analysis that this Court did there. And just to be clear, there is that here. Where is the language in Daniels that discusses the conflict about defendant being able to testify? What language in there are you relying upon to support your position that Daniels' case is similar to the case we have today? I don't have that case right in front of me, Your Honor. I'd be happy to refer to it during counsel's argument and tell you exactly what that is. Yes, because I was looking in there and I don't see where that was a pivotal issue in the case. That was one of the effects of the conflict between the attorney and his client. All right. I'll wait for you to find the precise language and give it to me when you return. Thank you. I'd be happy to. But also to be clear, there was a loss of trust in this case. Gillingham in his habeas declaration admits that because there was an irreconcilable conflict between him and his client, he was unable to build rapport with his client, he was unable to gain the trust from his client. And just like in Daniels, that impeded his ability to adequately investigate the penalty phase. Counsel, are either of those cases Supreme Court cases? No, they aren't, Your Honor. How do we deal with that under AEDPA? Well, again, if we analyze that theory, our irreconcilable conflict theory, which is a different theory than the trial court's failure to inquire, if we analyze our separate theory that there is an irreconcilable conflict, we can rely on circuit law so long as we first demonstrate that there's an unreasonable determination of the facts. Because once we demonstrate that, then the Court can turn to de novo review. And under de novo review, it can consult its own precedents. So just so I understand your argument, are you conceding that Daniels v. Woodford is only controlling if we determine that there was an unreasonable determination of the facts? That is correct, Your Honor. Okay. Same thing with the direct appeal cases that we cite. Ordinarily in an AEDPA case, those don't matter, unless you can first demonstrate that there's an unreasonable determination of the facts. And what was the unreasonable determination of facts that underpins your argument? Right. So the California Supreme Court in its direct appeal opinion said that Carter never insisted on testifying in the absence of any other evidence being presented. And I think it's really difficult to square that determination with what was said at the two Marsden hearings, but also what was said at the post-verdict hearing. I think what the California Supreme Court said was that Carter remained silent while his lawyer was speaking, never said a word to the Court, didn't contradict his lawyer, so that his lawyer's representations then, the Court was willing to assume, were, you know, accurately represented the tension between the two. And the tension was obvious to the trial court. It wasn't disguised. So what's unreasonable about those findings when Carter sits mute? And he certainly was, you know, an otherwise vocal guy, a guy who was certainly willing to stand up and shout about things that were bothering him. Well, yes and no about that, Your Honor. He was willing to bring things to his attorney's attention. And at the post-verdict hearing, he explained, and so did his attorney, exactly why he remained silent in court, because his attorney had told him, consistent with ordinary courtroom protocols, that when we get into court, I do the speaking, and you stay silent unless a judge asks you a question. And as this Court explained in Nunez v. Mueller, in that situation, it's unreasonable to expect a defendant to stand up in court and vindicate for themselves when their lawyer is standing right next to them. But the California Supreme Court said that Carter never insisted. And that is true. You've offered an explanation for why he didn't stand up. But what's wrong with that finding of fact that makes it an unreasonable finding of fact? Right. So I would draw the Court's attention to two different parts of the record. The first is that second Marsden hearing where Gillingham said that by resting without calling any witnesses, I was impeding my client's ability to testify. And then at the post-verdict hearing, this is what's really key. But the question, though, becomes, was it your client's desire to testify even if other witnesses were not called? And that's what the California Supreme Court paused on and said. It wasn't established that he wanted to testify even in that circumstance. The statement, to me, makes it sound like counsel recognizes the link between the two. By not calling other witnesses, that impeded his client's ability to testify. His client surely could have testified without other witnesses, but the California Supreme Court concluded that that's not the course he chose to take. Right. And, again, I think it's really difficult to square that with the post-verdict testimony because what was said at the post-verdict testimony is a question was put to Gillingham, Carter's lead attorney, and it was, did your client want to present a defense and testify? And he said, yes, he did. He didn't condition the right to testify on the presentation of any other evidence. And, in fact, at that first margin hearing, Gillingham said that his client emphatically disagreed with the decision to rest without presenting any witnesses, including Carter. And at the post-verdict hearing, he offered consistent corroborative testimony because he said that when he told Carter that he wasn't going to testify, Carter was in total disagreement. That's the testimony from the post-verdict hearing. And for that reason, I think it's really difficult to say that Carter's testimony was dependent on the presentation of any other witnesses. It was just supposed to be exercised in conjunction with that evidence. Well, I don't understand the difference there. The question is, is it unreasonable for the California Supreme Court to have concluded a factual matter that Carter wanted to testify whether or not other witnesses were called, whether or not another broader defense was put up by Gillingham? And the California Supreme Court said, as it viewed it, Carter's desire to testify was linked to a broader defense. And if there wasn't going to be a broader defense, then Carter acceded to the approach of not testifying himself. What evidence breaks that link between a broader defense and other testimony and Carter's desire to testify? Right. The Marsden hearings that were being held during the guilt phase were Carter was complaining about the fact that his attorney was litigating the case in a way that he disagreed with it. If there was some evidence in the record, Your Honor, that said Carter wanted to testify only if there was other evidence presented, then I would not be up here arguing that there was an unreasonable determination of facts. No, you'd find another argument. But you've got to flip that. What is it that leads us to conclude that the California court's determination that there was a connection between the two was unreasonable? Because they're inferring and making assumptions based on a record that doesn't support those assumptions. Well, that's where I pause, because I'm not sure what you've cited supports the proposition you've just stated. It seems to me that it's offered up to the trial court as a package, that is, that I don't see anything that Gillingham said that made it clear that Carter wanted to testify regardless of whether there was a broader defense. And that's what led the California Supreme Court to conclude that Carter's testimony and a broader defense with other witnesses were linked, that there was nothing that forced the conclusion. And I don't see anything that forces the conclusion that Carter's desire to testify was independent of whether a broader defense was submitted. If you could prove that, then the California determination of fact is unreasonable. But I haven't figured out what it is that makes me or should lead me to conclude that there's not a connection between those two pieces. Right. Again, I would just direct the Court's attention to the post-verdict testimony, because the post-verdict testimony, both Gillingham and Carter said that Carter wanted to testify. And Carter even went a little bit forward, took it one step more. He said that he felt it was necessary to testify. If he didn't feel it was necessary to testify, then I'm not sure why he would have these two margin hearings to bring to the Court's attention the fact that he wasn't being allowed to testify. But the margin hearing is an inquiry about the relationship with counsel. Correct. And if at some point, if Carter doesn't speak up to say, that's right, Your Honor, I not only wanted to testify, but if this guy's not going to let me, I don't want him. I don't want him sitting next to me anymore. And he never said that. So by sitting mute, it leaves the trial judge with the understanding that Gillingham has correctly represented this and that he doesn't have any objections. And that's basically what the California Supreme Court says. If he doesn't speak up, how are we supposed to know that there's anything different going on here? Well, again, Your Honor, I mean, this Court was very clear in Nunez v. Mueller that you don't expect a defendant to speak up in court when his attorney is represented. Okay. But then if you don't expect him to speak up, then how are we supposed to know what he thinks? And how are we supposed to know that he thinks anything different from what Gillingham has said? Well, because then we have these processes, like this post-verdict hearing that's held specifically for it. But let me actually, let me bring this back to the first theory. But that's not as helpful because it's after the fact. Right. When I was a trial court judge, defendants spoke up all the time in court. They would ask permission first, but they would say, Your Honor, may I make a comment? So I don't think it's unheard of for defendants to speak up in court, even if their attorneys have told them ahead of time not to. Well, so, Your Honor, what we do have here that I don't see in all my cases is we do have Gillingham saying at the post-verdict testimony, I instructed my client to be He said that I was told that I'm not supposed to speak. But I want to bring this all back because this gets, we've deviated and digressed from the first theory. And I think that the reason why the record might be a little bit messy right now is because the trial court didn't do what it was supposed to do, and that was adequately inquire into a conflict. So you have these Marsden hearings that are being asked for in the middle of the guilt phase. As this Court recognized in Schell v. Wittek, the very essence of a Marsden hearing is that the attorney-client relationship is falling short of Sixth Amendment standards. And if you practice in California State Court, you know that when you say the word Marsden, that's code for clear the courtroom because we have a serious problem. And what happened in this case is that you have this first Marsden that was held. The Court didn't ask any substantive questions to find out exactly how Carter was feeling, whether he was still able to trust his attorney, whether he was able to break down in the relationship. And then here's the thing that I think is most important, is that the second Marsden hearing, the judge learns that Gillingham was not accurately representing Carter's views because he said, I neglected to mention at the first that by resting without presenting any witnesses, that was preventing Carter from testifying. And both under California law and Federal law, the judge had a duty to inquire because you can't figure out if this conflict is making the relationship fall short of Sixth Amendment standards and find out exactly what is going on between the attorney and his client. We have how many Marsden hearings? Do we have three or four? There were four total with Carter. And Carter didn't speak up at any one of them? No, he didn't. But at the post-verdict hearing, and this goes back to a point that Judge Bibby made earlier, at the post-verdict hearing, Gillingham said that the synthesis of the three Marsden hearings, the first three Marsden hearings, was supposed to be mentioned at the first. And he failed to mention at the first that Carter wanted to testify, mention at the first that Carter wanted a new attorney. So what that shows is that Gillingham was failing his client over and over and over. And, again, this all could have been resolved if the Court had just done what it was supposed to do, which is ask questions to the defendant and put those questions to him. Counsel, may I ask you, in your opening brief, did you develop the theory about the trial judge's inadequate inquiry? Did you develop that in your opening brief? It's mentioned in our opening brief several times, Your Honor. It's not developed as your brief. But where is it? Because I don't see it in the arguments presented. It must have been in a side or something, because it's not really set forth as one of your primary arguments. And I agree with you about that. It wasn't developed as well in the opening brief. And I'll tell you again. Where is it exactly in the opening brief? At the very beginning of our argument, we explained that there are two different ways of getting around 2254d. And we mentioned Holloway requiring a trial court to adequately inquire. And I can pull the brief if you'd like right now, Your Honor. Well, I have the brief. I'm looking at it, and that's why I asked you the question, because I didn't see this argument developed there. It wasn't developed as well as it could have been, because in a way, the irreconcilable conflict test has three parts. It has an you inquire into the extent of the conflict between the attorney and his client, the inquiry, and then the timeliness of the request for substitution of counsel. And so we collapsed this first theory that's dealing with Holloway into that second prong of the irreconcilable conflict test. I realized when I was writing my reply brief that that was a messy way of presenting these arguments to the Court. But that being said, it is in the opening brief. And as we point in our reply brief — It's very well hidden. Well, I would be happy to direct the Court's attention to exactly where it is. But I see that I'm 20 minutes into this argument, and I was hoping to reserve six minutes. If the Court doesn't have any questions about this, I'd like to move on to ineffective assistance of counsel at penalty. All right. Okay. So the ineffective assistance of counsel at penalty claim is really a classic case about an attorney failing to follow up on relevant leads that would have led to the Trial counsel in this case were on notice through documents that they had gathered and witnesses that they had interviewed that Carter had serious mental health issues and that he had a nightmarish childhood. But like the attorneys in Wiggins v. Smith, Douglas v. Woodford, and Beemore v. Chappelle, trial counsel failed to follow up on those leads. And had they done so, they would have discovered compelling mitigation evidence that both the Supreme Court and this Court have said should be presented at penalty. They would have discovered that Carter has brain damage, that he has fetal alcohol syndrome, FAS, both of which could have offered an explanation for his conduct in this case. And they would have discovered evidence of his horrendous childhood. He grew up in Nome, Alaska, a place unlike any other place. There's no question that they got evidence of his horrendous childhood. But they chose a slightly different strategy, which was to touch on that childhood without blowing it up, and then to emphasize that he had overcome this and, therefore, he was a redeemable person, that he had been a good father, that he had tried to be a good husband, that he was despondent over the divorce, and that that might be the plight of any of us. That's a completely plausible strategy. It didn't work here. And so now we're going to think about why we should have done some other strategy. But it's very difficult to see why, from the outset, we should have known that we had to go after everything that happened in Nome and blow it up as big as we possibly could. Right. Well, so I think that puts the cart before the horse, though, Your Honor, because in order to make a reasonable decision about competing strategies, and just to be clear, I actually think that these strategies would have complemented each other, because it would have made it even more remarkable that he overcame this horrendous childhood and then was able to make something of himself if they presented more evidence of the abuse. The risk that counsel was concerned with at the time was that it would show that he was incorrigible, that is, that his childhood was so awful that there was no way he was ever going to make it in regular life, and that that would run against him. Well, I don't know if we actually have that in the record, Your Honor. What we have in the record is the defense memo from the investigator from the Los Angeles case. And you see him do a really weird about face in the memo, where he says, I talked to Jerry Carter. He essentially says that there is no abuse here, and so we should just focus on the adulthood of Carter. And why I think that's really, really troubling is because counsel had in their possession a lot of documents that suggested that there was really, really horrible abuse here. They had documents that said that Carter had been chained for weeks at a time, that his parents constantly chained him when they went out socializing. And then here's another one, is that when he was 15 years old, he was going through the juvenile court system, and he was evaluated by a probation officer. And the probation officer looked at his home life and said it was very neurotic, very poor, and recommended that the court take the extreme measure of taking Carter out of his home and placing him in foster care. And so counsel did what they were supposed to do. They went up to Nome, and they started investigating this, and they actually received some corroboration of it. Jerry testified about a single incident of chaining, and then they talked to Cheryl Stavish, and she testified or she told them about a different instance. But there's no indication in the record that they expanded their search beyond that. And then even when they did present this evidence, Your Honor, they presented it almost as discipline. It wasn't so much that the parents were even abusing him. And you look at the prosecutor's argument. The prosecutor said there was no abuse here. This is a case about discipline. He was a bad kid. Ginsburg. If we accept your argument, can you meet the prejudice prong? We can. How? I would direct the Court's attention to cases like Douglas v. Woodford. What about the facts of this case? You would have to show that it's more likely than not that he would not have received the death penalty. Well, it's actually a reasonable probability. A reasonable probability that he would not have received the death penalty, right? Yeah. But in Strickland, of course, that's less than a preponderance of the standard, just to be clear. Okay. But I do want to say that for— Even with that standard, with the evidence that was in the record, how can you meet that? Right. Because I think you have to accumulate all the missing mitigation evidence. And it wasn't just the evidence about the child— And weigh that against the evidence that was presented to support the death penalty. Correct? I'm sorry. I didn't quite understand that. Weigh that against the evidence that was in the record to support the death penalty. Exactly. Exactly. And I think that the child abuse, you know, him being treated like a sled dog by his father being chained to tables and cabin posts and beds at all times and being forced to eat food and water and drink water off the floor, that would have been a pretty effective counterweight to something aggravating. But so would have the brain damage. At this trial, the attorney says in his declaration that he suspected brain damage, but he didn't follow his expert's advice to get additional testing. And that additional testing would have led to the discovery that Carter has brain damage and FAS, both of which affect his frontal lobe. And the reason why that's so important is because the frontal lobe controls the executive functions of a person's brain. Those executive functions control a person's ability to regulate and inhibit their behavior, their emotions, and their impulses. And when they're not functioning well, a person lacks the normal inhibitions that someone else does. So it substantially impairs their ability to conform their conduct to the law. And that is a statutory factor, a mitigating factor under California law. And if someone is unable to substantially conform their behavior to the law, that lessens their moral culpability. None of this evidence was probably going to make the jury like Carter anymore, but it would have helped them understand exactly what happened in this case. When you have a 28-year-old man who had no violent history, he had a couple of felony burglaries when he was in his early 20s, and otherwise lived a rather unremarkable life, and then you have two to three weeks where he just sort of decompensates really rapidly and a whole bunch of horrible crimes happen, Your Honor. They don't happen. He commits them. Well, he commits them, Your Honor, yes. I'm not trying to downplay it, but there was an explanation here for this. You have someone who is facing extreme abandonment, extreme neglect, and then who was consuming a lot of alcohol and consuming a lot of cocaine. And this was having a really, really negative impact on his brain. So when you take all of that together. Counsel, that could be looked at two different ways. The fact that he acted appropriately for so many years could be used against the argument that he was acting, you know, under the influence of fetal alcohol syndrome or some other phenomenon because he had acted rationally for so many years. Why wouldn't it be reasonable for the California Supreme Court to conclude that that evidence could have gone both ways? So I'd like to answer that question, then, if I could reserve the remaining time for rebuttal. I think what it really comes down to is that you see that during the months that were preceding these crimes that Carter was experiencing things that he had never experienced before. Divorce. His two children were being taken from him. There's no indication in the record that he was consuming a lot of alcohol or cocaine before all that happened.  And again, it's the brain damage in connection with the consumption of alcohol, with the consumption of cocaine, and then with all these experiences of abandonment and neglect that he was experiencing at that time. And so I think all of that would have been a very effective counterweight, Your Honor. I see that I'm out of time. Thank you, Counsel. I'll just remind you that when you returned, you were going to point out two things, the language in the Daniels case that discussed the failure to call the defendant as a witness and the opening brief discussion of the failure of the trial judge to conduct an adequate inquiry. Okay. Thank you very much, Your Honor. I appreciate it. Thank you, Counsel. Good morning, Your Honors. May it please the Court, Annie Featherman Frazier, Deputy Attorney General on behalf of the people. The California Supreme Court reasonably determined that Carter's Sixth Amendment rights were not violated by virtue of a conflict between him and his counsel over the strategy to pursue in trial. A tactical disagreement about strategy does not create a sufficient conflict as to warrant substitution of counsel. Carter raised the ---- Well, it can. In this case, it certainly didn't. It was a ---- I'm just ---- you can get to the facts of this case, but you made what seems to be a broad proposition that you just can't have a conflict that reaches that level. And in some circumstances, you can. There can be a complete breakdown in communications because they have different ideas. Certainly in some cases. In this case, there was not. The conflict centered over the strategy to pursue in the guilt phase. Carter was a sophisticated defendant. He had already conflicted off one counsel. His initial counsel he had substituted because of a conflict over defense strategy. He knew how to do it. He knew what words to say to achieve that goal. With Mr. Gillingham, he never requested Mr. Gillingham be substituted. He wanted to make the record clear, and Mr. Gillingham did make the record clear, that they had a conflict over strategy. And that strategy was, Gillingham wanted to focus on the penalty phase and not present a full-blown defense to the guilt charges. Well, what's your response to opposing counsel's representation that the conflict was over whether the defendant would testify and that he didn't make that known to the court because he was told not to talk at the court hearings? What's your response? He ---- a few things. One is he, in the post-verdict hearings, he testified very clearly that he, the representations made by Gillingham in those four hearings were accurate representations. He never testified that, no, that was not accurate. I just wanted to testify. Gillingham made it very clear that Carter wanted to testify and to ---- after presenting a defense. During the ---- he had the first hearing where he explained that they had a conflict. The next day ---- Who explained? The attorney explained? Gillingham explained they had a conflict. But the next day or later that day, Gillingham said, I wanted to put a few things on the record that Carter told me I missed in that hearing. So Carter clearly told Gillingham what he wanted him to represent to the court, and he said there were a few witnesses he wanted to ---- other witnesses, and he wanted to testify. So Gillingham made that clear to the court that the conflict was that he wanted to present a defense and testify. In the post-verdict hearings, Gillingham said very clearly, by not putting on the witnesses, it also precluded the potential of Mr. Carter testifying based on, however, what those witnesses would have testified to and the effect of their testimony. When defendant testified post-hearing, he said, I told him he wanted to call witnesses, put on a defense, and testify. So even in the post-verdict hearing, Carter never said, I wanted to testify regardless of what Gillingham did. He never said Gillingham misrepresented what he had stated in the Morrison hearing. Even in that hearing, it was always clear that Carter's wanting to testify was based on Gillingham putting on a full-blown defense. The California Supreme Court, therefore, was reasonable in making that determination. Any other determination is just not reasonable and can't be squared with the facts. The ---- Gillingham also, in his declaration, said that he anticipated that Carter would testify on his own behalf after presentation of defense witnesses. So he consistently, Gillingham consistently stated that it was tied to presenting a guilt-based defense. And that was a defense strategy that was, that Gillingham made that wasn't a basis for removal of counsel. Moreover, Carter nor Gillingham ever requested that Gillingham be removed. And again, Carter knew how to do that since he had previously requested and been granted a new counsel. After the guilt phase, Gillingham stated to the court in one of these hearings, Carter has requested you appoint an attorney, Rowan Klein, for the purposes of a post-verdict motion, not for the penalty phase. So again, Carter knew how to request counsel. He requested counsel for a specific purpose. And Gillingham said at that point, I'm opposed to it. And the court didn't grant it at that point. So Carter's ---- it's clear throughout the record that Carter, through Gillingham, let his needs and requests be met. He was very vocal in that manner through Gillingham. And there's no reasonable inference from the record that he, his needs and desires were not adequately represented by Gillingham, even in the post-conviction hearing. Well, on some level, we know that there was a disagreement, that Carter wanted to put on a guilt phase defense, and Gillingham did not do that. Correct. Is that true? So we know that there was a disagreement between the two of them. You know, last year in McCoy, the Supreme Court said that counsel doesn't have the authority to deny a guilt phase defense. Now, McCoy isn't directly applicable here, but the concept there is one that seems to speak to this kind of situation. The ---- there's no doubt there was a conflict between Carter and Gillingham about how to present the guilt phase defense and what the strategy was. McCoy was a ---- was decided last year. So what the ---- what you have to look at, what this Court has to look at is what the California Supreme Court, what the United States Supreme Court precedent was at the time the California Supreme Court issued its determination. Moreover, McCoy is distinguishable because in McCoy, the defendant wanted to testify, did, in fact, testify, and in spite of him testifying to an alibi, his counsel got up and admitted that he committed the crimes. Here, those are just very different facts. Here, Gillingham never ---- Gillingham never conceded guilt in the manner of he didn't get up and say my client committed these crimes. He never admitted that. He argued in closing argument that the prosecution had a burden of proof, that they couldn't be swayed by sympathy, that he urged the jurors not to defer to other jurors. So in this case, Gillingham did put the prosecution to its burden of proof, unlike in McCoy. And this is ---- and in Florida v. Nixon, which was the applicable law that the California Supreme Court relied on, the Court there said it is sometimes the best strategy in a case like this where the guilt was overwhelming to focus on the penalty phase and save your credibility by not contesting issues that were ---- would be harmful to you in the penalty phase. When Carter was talking ---- when Carter discussed in the post-conviction motion, when Carter said what ---- when they talked about what witnesses Carter wanted to testify, he wanted to have come testify, he wanted some witnesses. For example, he said he wanted to have the ---- a pathologist come and testify that one of the victims, Ms. Guthrie, had consensual sex with him instead of was raped. It just ---- that is not a credible defense to put on in front of a jury. And so Mr. Gillingham reasonably made that determination, that those were not the kind of witnesses that you would want to call if you want to focus more on the penalty phase. So it was a ---- and ---- I don't think anybody is arguing with the logic of Mr. Gillingham's approach, and counsel hasn't tried to ---- I mean, they've made an argument that there was prejudice because maybe some juror might have been swayed by Carter testifying, but there's no attempt to offer a coherent defense that Carter could have offered up in the guilt phase. I want to be clear, I don't disagree with anything you just said. One of the things that, and again, McCoy doesn't directly apply, it recognizes McCoy's testimony would have been madness. He didn't have a defense to offer, but the Court wound up saying that's his decision to make. Now, should we be influenced by the same concern here? Well, in McCoy, the defendant wanted to testify regardless of whether there was a defense, and did in fact testify in spite of the fact there was no other defense offered. He testified to an alibi that was not a very credible alibi, and defense counsel didn't even argue that it was credible. So that's a very different circumstance. So while the principle can still be applied, it just isn't factually similar, and again, that wasn't Supreme Court precedent at the time the California Supreme Court determined that there was no claim. Counsel, in your view, what does the record show regarding the defendant's desire to testify, expressed desire to testify? What does the record show? The record shows that he never expressed a desire to testify independent of presenting a full-blown guilt defense. It was always conditioned on presenting a defense and testifying. He was very clear, and his testimony post-conviction said, I told him I wanted to call witnesses, put on a defense, and testify. And that's a direct quote from Carter when he testified post-hearing. So the record is very clear that he never requested to testify independent of presenting a defense. And therefore, the California Supreme Court reasonably made that determination. With regards, if the Court has no further questions on the conflict issue, I can move to the ineffective assistance of counsel claim. And in that claim, here we have lawyers who have done a very thorough investigation. They went to Alaska numerous times. Their investigator went to Alaska. They had two investigators at least go to Alaska. One of them went three times. They interviewed numerous witnesses in the range of 40. And after that extensive investigation, made a tactical decision. Casey Cohen was the investigator, and he said he had heard rumors that Carter was abused. Those same rumors are what counsel is arguing are sufficient. If you look at what the evidence that was presented was, and you look at the post- conviction declarations, the post-conviction declarations are not based on firsthand information. It's primarily based on rumors. For example, counsel said that Carter was forced to eat like a dog off the floor. If you look at the actual evidence, one of the witnesses who in fact did testify, Bertha Edzuna, stated that she once went to their house and Jerry was on the table and Carter was sitting on the floor eating. It didn't say he was eating food off the floor or drinking water in a bowl off the floor, as Carter would have you believe. And moreover, that witness actually testified in the Los Angeles trial. She was specifically asked, was Jerry Carter treated worse than, or was Dean Carter treated worse than Jerry Carter? So the representations are really much more, they're really based on rumor and speculation more than concrete testimony. Counsel, what is there in the record regarding the investigation of fetal alcohol syndrome and brain damage? There was, we don't have any information that the trial counsel was aware of fetal alcohol syndrome. However, we do know that defense counsel consulted mental health professionals, and after consultation with mental health professionals, elected not to present a statement. Based on the post-conviction declarations, it states that that was, fetal alcohol syndrome was an emerging field, and it actually, one of the declarations states there wasn't, they didn't have the criteria until 2004, longer than in this trial, much after this trial, and that in fact, at the time, even by the post-conviction declarations, there was fetal alcohol diagnoses in children, but it hadn't quite yet been extrapolated to adults. So it's hard to fault counsel who did a thorough investigation, who did not present a theory of defense that was not fully developed at the time, and again, the practical decisions based after a thorough investigation. What about the brain damage? What investigation was undertaken in regard to brain damage based on the evidence that was known to the defense counsel? It's unclear what was known about the brain damage prior to, from the defense attorneys at the time of trial. What we do know is they consulted mental health professionals, and there are no declarations in the record what their mental health professionals had discovered. That was not presented. Would mental health professionals be the ones that would opine about brain damage? Certainly. Were they physicians? That is not clear from the record. That was never, counsel did not put in any of those declarations what those mental health professionals determined or evaluated. However, what is known is there are reports in the file from before Carter committed these heinous crimes that he was a classic sociopath personality. So based on the fact there is an investigation, we have these crimes that he's been elected not to present a mental impairment defense based on the nature of the crimes. Counsel talked about how brain, the factor in brain damage is it affects executive functioning. This was a defendant who had a extremely sophisticated, meticulous crime spree where he went up and down the coast raping women. He did a lot, he took a lot of actions that showed he was functioning very well. He wiped down wine glasses to make sure his prints were not on them. He took a car from Oakland, drove it to, drove it all the way to L.A. after killing the Oakland victim and taking some of her belongings. Took the victim's car from L.A. and moved it a block and a half away from her house to avoid detection. Then stole, killed three women in Los Angeles after raping two of them. Put their, in one of the apartments, put their bodies in a, stacked them up in a closet. One of them, there was a phone call made, and you could fairly assume it was the defendant, to her place of employment stating, Susan Knowles will not be into work today. She got into a car accident. Clearly that was someone who was trying to throw off her employer so they wouldn't detect that she was not coming into work. Then he drove that car, stole that car, and drove to San Diego and killed yet, and raped yet another unsuspecting victim. Got her ATM password, had it in his pocket, and then took as much money as he could out of her ATM. This is a man, he had belongings from every one of those women. And this is a man who used, who had a very sophisticated crime spree. And a argument about his lack of executive functioning would not have bode well. So it clearly was a tactical decision by defense counsel not to present that kind of evidence that would not, would have allowed the prosecutor to bring out all those facts yet again in cross-examining those witnesses of whether those highly sophisticated actions were of someone who was lacking executive function or impulse control. This was not a crime where he went into a, someplace and had a complete mental lapse. This was over a long period of time showing great sophistication. So it's entirely reasonable that defense counsel would make a tactical decision not to present that evidence. Similarly, that goes to the prejudice of given the sophistication of his crimes, the fact that he had brain damage and fetal alcohol syndrome would not be the kind of evidence that would have tipped the balance in favor of the defendant. This jury had already convicted the defendant of the three murders and sex crimes and all the special circumstances, and then heard about a brutal rape that he had committed before that, where he had held this woman at knife point and raped her for hours on end. It just is hard to reconcile with this mental health evidence. In terms of the, I want to go back to something else, and that is the tactical decision not to present more child abuse. Counsel states it was a about face by the defense not to present this evidence. But if you look at the Casey Cohen's interview of Jerry Carter, which I believe is at the Excerpts of Record at 944, Jerry, Casey Cohen talks to Jerry and gets, and Jerry would be in the best position to know about the abuse. He was there. He lived in the home. He interviewed him, and in that he said, based on the talking to Jerry, I don't think it would be a good idea to pursue this type of evidence. He said, and I want to get a quote real quick, he said that there was no history of child abuse so significant that it would tie in with the general theory as to why Dean ends up murdering someone. Instead, they opted to have him talk about the good qualities of Carter and how his mother was neglectful and did not talk about him or offer any support. So if you look at that defense investigator report, he's the one who's interviewing Jerry. He's assessing his credibility and advising counsel on whether that would be a credible defense. And that clearly shows that it was a tactical decision not to focus on the child abuse. And in spite of that, they did put on enough evidence of child abuse to make Carter somewhat sympathetic. I thought it was interesting when, in responding to a question of this Court about this potential mitigation evidence and how he could have a life where he didn't have violence up until this point, and counsel described, well, that's because he was going through this divorce and he'd been okay and he spiraled out of control. Well, that's interesting, because that's exactly what trial counsel opted to focus on. That is a sympathetic mitigating material, that he was a person worthy of sparing his life in spite of this, because before that, he had been a — he had a period of time where he was successful, he was a good cameraman, and that was a reasonable mitigation strategy for the defense. So not only could he not show deficient performance, he can't show prejudice. And — Counsel, if we were to disagree with you on the penalty, on the penalty portion of this, what — what is the effect of the governor's declaration on the case? Well, the order from the governor did not affect — states it does not affect current convictions and sentences. So at this point, the Attorney General's office cannot identify a direct impact the executive order may have. We would — So if we — so if we thought — if we thought there was error in the penalty phase, the State wants to go back and — and we would just have to go back and redo this anyway? Well, that would be up to the district attorney's office. So if there was — if — and I apologize, I didn't track your question, which was my fault. But if — if this court were to find that there weren't — that the penalty phase was reversed, then it would go back to the district attorney's office, and the district attorney's office would make that determination of whether they would retry it. If they didn't retry it, what would be the consequences? If it did not retry it? Right. If the DA's office elected not to retry the penalty phase, what would happen? Does it go back to a district — to a State trial judge for resentencing? Or what — what happens at that point? Yes. I believe it would be remanded to the trial court for resentencing. It doesn't automatically revert to a life without parole or something else? I don't — I do believe it have to — I don't believe it automatically revert, although I think with the special circumstances alleged, that that would — that trial judge would not have discretion to do anything other than a life without parole sentence. Mm-hmm. Okay. But I do think that, again, the California Supreme Court reasonably determined that the — that there was not ineffective assistance counsel in the penalty phase, and that is — it was a reasonable determination. The evidence, as I stated, was based on rumors, speculation, and the trial counsel made tactical, reasonable decisions, and there — so counsel was not deficient, nor can Carter show prejudice. Counsel, did you read opposing counsel's opening brief as fairly raising the issue of the failure of the trial judge to conduct an adequate Morrison inquiry? What I recall from the opening brief is that it stated that there are three factors that this Court looks at in determining whether the inquiry in a Morrison-type hearing is adequate or is — whether — there are three factors to look at in determining the viability of a Morrison claim, and one was the extent of the conflict, and I did believe he mentioned the adequacy of the conflict, and the third one was the timeliness. However, he based that — that three-part test, it was based on a Ninth Circuit case, not United States Supreme Court precedent. So I don't — I believe the response in our brief was that we can look at those factors as being somewhat persuasive. However, those aren't three factors that the United States Supreme Court has determined to evaluate, and since counsel never — neither counsel nor Carter ever specifically requested his attorney be removed, it really doesn't — we don't even get into that inquiry. However, if we were, the trial judge's inquiry was adequate. There's no specific questions that need to be asked, and it was clear that Gillingham wanted to put certain things on the record and — and did so, but there was no follow-up that needed to be done. He aired his complaints, and there wasn't anything that's required. Counsel talked about Daniels v. Woodford, and my understanding of that case is that was a case where there was an inadequate inquiry, but that was because the nature of the conflict was never aired. Defense counsel never stated what the conflict was. They said, we have a conflict. And the Court took nine months to remove the counsel, and then an inexperienced attorney was appointed, and there was just never any inquiry into the conflict. But here, the conflict was adequately aired, and even at this point in juncture, there's no indication that — that there's no discrepancy on what the conflict was. The conflict was that Gillingham wanted to treat it as a penalty phase — or a penalty case and not contest guilt, and Carter wanted to present a full-blown guilt defense and testify. If the Court has no further questions, I would submit and ask to affirm the judgment. Thank you, Counsel Rebuttal. So, Judge Rollinson, in response to your request, I would direct the Court's attention to 428F3rd at 1191 and 1199. That's the Daniels v. Woodford case. 1191 talks about how Daniels appeared willing to testify, and at 1199, the — this Court explained that the conflict prevented the jury from ever hearing his testimony. As for whether our argument was properly presented in our opening brief — Wait. Did that say anything about a trial judge's duty to inquire? No, no, no. But that — that goes towards the extent of the conflict, not what the adequacy of the inquiry is. As for whether the argument about the failure of the trial court to adequately inquire, whether that was an unreasonable application of Holloway, Wheat, and Wood, those are all three Supreme Court cases. So, Counsel, that's in the Statement of Facts at 1191, right? Correct. And then 1199. So you cited this case for the proposition that — that it represents a conflict if an attorney fails to call a defendant as a witness. Not just for that. I think that what we're citing this case for and the Walker case for, which — Well, that's what I asked you about. Okay. Where in the — where — what case says that the failure to call defendant as a witness is a conflict. And you told me Daniels. And then I ask you, what's the specific language you're counting on in there? Well, again, it goes towards how did the conflict result in a breakdown of the attorney-client relationship. Okay. And that's what Daniels explains. It walks through how it affected the guilt phase. It walks through how it also affected the penalty phase. All right. As for your other question, Your Honor, the second — on page 28 of our opening brief, the summary of argument, the first full paragraph clearly lays out that we are arguing that the trial court failed to adequately inquire. I would again direct the Court's attention to page 32 of our opening brief, which cites Holloway, and then — Page 28 of the opening brief? Yes, which is our summary of argument. The paragraph that begins with the trial court. Then also on page 38 of our actual argument, we explain how there was an unreasonable application of Holloway. Again, we could have spaced this out better and presented it more cleanly, but because the adequacy of the inquiry is one of the factors in the irreconcilable conflict analysis, we collapsed it into that. In fairness, I think opposing counsel did understand it that way. I think so, too, because the adequacy of the inquiry is addressed in the answering brief. There were a lot of arguments made about the penalty phase IAC claim. There's some overlap between this case and the next case, and so I would like to deal with it there. But I will point out that, again, it puts the carpet before the horse to say that the attorney made a reasonable decision not to present any brain damage evidence when he never discovered the brain damage evidence. And he even admits in his declaration, this is at ER page 960, that he suspected organic brain damage, and he was told that he should conduct additional testing, and he never conducted those testing. But opposing counsel's position is that he consulted mental health professionals, and thereby that was a reasonable investigation that supported his decision not to delve further into the brain damage inquiry. What's your response? Well, except the experts that he consulted said that we need to do more, and he didn't do more. All right. Thank you, counsel. Thank you to both counsel. Case number 13-99003 is submitted for decision by the court. We will now hear argument in case number 13-99007.
judges: Rawlinson, Clifton, Bybee